COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-040-CV
 
  
IN THE INTEREST OF
 
  
A.J.L. AND C.R.L., CHILDREN
  
  
------------
 
FROM THE 211TH 
DISTRICT COURT OF DENTON COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Michelle L. appeals the trial court’s order terminating her parental rights to 
her children, A.J.L. and C.R.L. In two points, she complains that: (1) the trial 
court erred by allowing the attorneys for respondent, Donald “Bobby” Wall, 
and intervenors, Jose and Yolinda Trevino, to present closing arguments to the 
jury; and (2) the trial court abused its discretion by allowing expert opinions 
when there were no grounds for admissibility under a Daubert/Robinson 
analysis or because the opinions were based upon hearsay. In three supplemental 
points, appellant argues that: (1) the evidence is legally and factually 
insufficient to prove appellant knowingly placed or allowed the children to 
remain in conditions and surroundings that endangered their physical or 
emotional well being; (2) the evidence is legally and factually insufficient to 
prove appellant engaged in conduct or knowingly placed the children with persons 
who engaged in conduct that endangered their physical or emotional well being; 
and (3) the evidence is factually insufficient to prove that termination of 
appellant’s parental rights was in the best interest of the children. We 
affirm.
FACTS
        Appellant 
grew up in foster care and had a lifetime history of violence and an inability 
to control her temper and emotions.  Child Protective Services in Kansas 
(KCPS) and Texas Department of Family and Protective Services (DFPS) had removed 
appellant’s children from her care on multiple occasions because they had 
bruises, burns, and bites on them.  Appellant also had a criminal and drug 
abuse history and an unstable home life and employment history.  After the 
third removal, DFPS petitioned to terminate appellant’s parental rights to her 
two children.
        At 
trial, the Trevinos, paternal grandparents of A.J.L., intervened asking to be 
named joint managing conservators of A.J.L.  The natural father of C.R.L., 
Donald “Bobby” Wall, filed an original answer to the termination petition 
and filed a counter-petition asking to be named the sole managing conservator of 
C.R.L.
        During 
the trial, the court allowed play therapist Brigitte Iafrate to testify on play 
therapy she conducted with A.J.L.  Using puppets in a play acting scenario, 
it was her opinion that A.J.L. felt that he needed to protect his baby sister 
and that he had been traumatized at home.  Before allowing Iafrate to testify, the 
trial court conducted a Daubert hearing to determine the admissibility Iafrate’s expert 
testimony as a professional counselor.  Appellant objected to portions of Iafrate’s testimony, 
contending it was unreliable and based on hearsay.  The trial court 
overruled her objections.
        Prior 
to closing arguments, appellant objected to the Trevinos and Wall making closing 
arguments to the jury. The trial court overruled her objection, and both 
presented closing arguments to the jury.  The trial court charged the jury 
only on termination, not conservatorship.  The trial court terminated 
appellant’s parental rights based on the jury’s findings of endangerment and 
conduct as to both children.
CLOSING ARGUMENTS
        In 
her first point, appellant complains that the trial court erred by allowing the 
attorneys for Wall and the Trevinos to present closing arguments to the jury. 
The State filed its first amended petition alleging that Wall was the biological 
father of C.R.L. and asked the court to find that, if reunification could not be 
achieved, the court terminate his parental rights. Wall, as a respondent, 
answered with a general denial and filed a counter-petition affirming that he 
was the biological father of C.R.L., asking that appellant’s parental rights 
to C.R.L. be terminated, and that the trial court award him custody of C.R.L.  
As a respondent, Wall is also a party to the suit.  The Trevinos intervened 
and filed a petition in intervention requesting custody of A.J.L.  The 
family code expressly provides grandparents with standing to intervene subject 
to the trial court’s discretion.  Tex. Fam. Code Ann. § 102.004 (Vernon 2002). 
Unless the trial court does not allow the intervention, the intervenors become 
parties to the suit for all purposes. In re D.D.M., 116 S.W.3d 224, 232 
(Tex. App.—Tyler 2003, no pet.).  Because the trial court approved the 
intervention, the Trevinos are also parties to the suit.
        After 
all the evidence is presented in the case, the parties may argue the case to the 
jury.  Tex. R. Civ. P. 269.  Where there are 
several parties to a case, the trial court may prescribe the order of argument 
between them. Id.
        Appellant 
argues that because the jury charge addressed only termination issues, Wall and 
the Trevinos should not have been allowed to make closing arguments.  
Because they only sought custody of the children and the jury charge did not 
address custody, appellant contends they had no issues before the jury and 
should not have been allowed to argue.  Appellant contends that the holding 
of City of Houston v. Sam P. Wallace & Co., 585 S.W.2d 669 (Tex. 
1979) applies to the present case because the supreme court held that parties 
without issues before the jury should not be allowed to make closing 
arguments.  Id. at 673 . However, Wallace can be 
distinguished from this case because Wallace involved a settlement 
agreement.
        In 
Wallace, both the city and employee had actions against the contractor as 
their common adversary and were both designated as plaintiffs.  Id. 
The supreme court held that because the employee secretly settled with the 
contractor and agreed not to argue negligence against it, the trial was not a 
fair adversary proceeding. Id. Moreover, the court concluded that because 
after settling with the contractor, the subcontractor's employee had no further 
claims against anybody and no other party had any claim against him, his counsel 
had no purpose in making a jury argument. Id. at 672.
        The 
present case does not involve a settlement agreement, nor was there an unfair 
shift in the adversarial alignment of the parties at closing argument. To the 
contrary, the alignment of these parties remained consistent throughout the 
trial. Contrary to appellant’s assertions, both Wall and the Trevinos filed 
pleadings. Additionally, both had an interest regarding termination of 
appellant’s parental rights. Wall specifically requested that appellant’s 
rights to C.R.L. be terminated and the Trevinos asked to be appointed managing 
conservators of A.J.L.  Upon the termination of parental rights, the trial 
court shall appoint a managing conservator of the child.  Tex. Fam. Code Ann. § 161.207 (Vernon 
2002).  Thus, the termination of appellant’s rights was a matter of 
interest to both Wall and the Trevinos.  Thus, we conclude that the holding 
in Wallace is inapplicable to the present case because the parties still 
had an interest in the termination of appellant’s parental rights.  We 
hold that the trial court did not err by allowing Wall and the Trevinos to make 
closing arguments to the jury.  Appellant’s first point is overruled.
EXPERT WITNESS TESTIMONY
        Under 
her second point, appellant complains that the trial court erred by admitting 
the expert testimony given by licensed professional counselor Brigitte Iafrate because (1) it was 
not scientifically reliable under Daubert v. Merrell Dow Pharm., Inc., 
509 U.S. 579, 113 S. Ct. 2786 (1993), and (2) the evidence was based, in part, 
on hearsay. Iafrate 
testified about play therapy that she conducted on A.J.L.
        Rule 
of evidence 702 governs the admissibility of expert testimony.  Tex. R. Evid. 702; Gammill v. Jack 
Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998); E.I. du Pont 
de Nemours & Co. v. Robinson, 923 S.W.2d 549, 554 (Tex. 1995).  
Texas Rule of Evidence 702 provides:
 
If scientific, technical, or 
other specialized knowledge will assist the trier of fact to understand the 
evidence or to determine a fact in issue, a witness qualified as an expert by 
knowledge, skill, experience, training, or education, may testify thereto in the 
form of an opinion or otherwise.
Tex. R. Evid. 702.
        Once 
the opposing party objects to proffered expert testimony, the proponent of the 
witness's testimony bears the burden of demonstrating its admissibility.  Guadalupe-Blanco 
River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002); Robinson, 923 
S.W.2d at 557.  To be admissible, the proponent must demonstrate: (1) that 
the expert is qualified; and (2) that the expert's testimony is relevant and 
reliable.  See Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex. 
2001); Robinson, 923 S.W.2d at 556; see also Kraft, 77 S.W.3d at 
807.
        At 
the Daubert hearing, Iafrate 
testified that she had been a licensed professional counselor in Texas since 
1993.  She received a bachelor’s degree in psychology from Texas A&M, 
a master’s degree in counselor education, with an emphasis on play therapy, 
from the University of North Texas (UNT), and had regularly attended continuing 
education seminars focusing on play therapy and techniques.  She received 
special training in these methods at UNT and at continuing education 
conferences.  She testified that play therapy was one of her areas of 
expertise and that she had worked with a minimum of one-hundred preschool 
children.  She evaluated A.J.L. using these methods over the course of 
fourteen different therapy sessions.
        The 
supreme court has identified a non-exclusive list of factors which can be 
considered in assessing the reliability of scientific evidence. [1]  See Gammill, 972 S.W.2d at 720; see also 
Daubert, 509 U.S. at 593-95, 113 S. Ct. at 2796-98.  In Nenno v. 
State, the court of criminal appeals divided “scientific” expertise into 
two subcategories: “hard” sciences and “soft” sciences.  970 S.W.2d 
549, 560 (Tex. Crim. App. 1998), overruled on other grounds by, State v. 
Terrazas, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).
        The 
court in Nenno provided a framework by which to test the reliability of 
the fields outside of hard science, such as social sciences or other fields 
based upon experience and training as opposed to scientific method (soft 
sciences).  Id. at 561; In re J.B., 93 S.W.3d 609, 629-31 
(Tex. App.—Waco 2002, pet. denied) (explaining why Nenno framework 
should be used to evaluate “soft science” testimony in civil cases pending 
guidance from the supreme court); see also In re G.B., No. 07-01-0210-CV, 
2003 WL 22327191, *2 (Tex. App.—Amarillo Oct. 10, 2003, no pet.) (memo op.) 
(applying Nenno to a parental termination case). In assessing the 
reliability of fields outside of hard science, the trial court looks at whether 
(1) the field of expertise is a legitimate one, (2) the subject matter of the 
expert’s testimony is within the scope of that field and (3) the expert’s 
testimony properly relies upon or utilizes the principles involved in that 
field. Nenno, 970 S.W.2d at 561.
        We 
review the court's determination under an abuse-of-discretion standard.  See 
Kraft, 77 S.W.3d at 807; Helena Chem. Co., 47 S.W.3d at 499; Robinson, 
923 S.W.2d at 558.  To determine whether a trial court abused its 
discretion, we must decide whether the trial court acted without reference to 
any guiding rules or principles; in other words, whether the act was arbitrary 
or unreasonable.  See Carpenter v. Cimarron Hydrocarbons Corp., 98 
S.W.3d 682, 687 (Tex. 2002); Downer v. Aquamarine Operators, Inc., 701 
S.W.2d 238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986).  
Merely because a trial court may decide a matter within its discretion in a 
different manner than an appellate court would in a similar circumstance does 
not demonstrate that an abuse of discretion has occurred. Downer, 701 
S.W.2d at 241-42.
        An 
abuse of discretion does not occur where the trial court bases its decisions on 
conflicting evidence.  Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 
1978); see also Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997).  
Furthermore, an abuse of discretion does not occur as long as some evidence of 
substantive and probative character exists to support the trial court’s 
decision. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002); Holley 
v. Holley, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 
1993, writ denied).  An appellate court must uphold the trial court’s 
evidentiary ruling if there is any legitimate basis in the record for the 
ruling. Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 
1998).
        First, 
we focus on whether the trial court abused its discretion in determining that 
play therapy is a legitimate field of expertise. Iafrate testified that play 
therapy is highly regarded and is a generally accepted method for counseling 
children.   She reviewed the research in the area of play therapy and 
testified that the research showed that play therapy is a successful and 
effective way to work with children.  She found no studies that challenged 
the reliability of play therapy. Moreover, she noted that it has been used for 
decades and is widely accepted in the counseling community.  Additionally, 
caselaw illustrates that play therapy is often used as a basis for expert 
testimony.[2]   Based upon this evidence, we 
conclude that the trial court did not err in determining that play therapy is a 
legitimate field of expertise.
        Play 
therapy uses toys as “therapeutic metaphors” to help children express 
themselves and their feelings.  Iafrate described the types 
of play therapy that she used.  First, she built a safe environment and 
rapport with the child using the client-centered method.  Eventually she 
switched to the more directive Alderian method where the therapist is more 
interactive in helping the child identify important aspects of their 
environment.  She used these techniques in a manner consistent with her 
training during her fourteen counseling sessions with A.J.L.
        With 
respect to whether Iafrate’s 
testimony was within the scope of her legitimate field of expertise and whether 
she properly utilized the principles of play therapy, we look to her testimony 
at trial.  She testified that A.J.L. came to therapy with her in order to 
learn how to cope with the abuse that he had suffered.  According to Iafrate, when A.J.L. first 
started coming to her he behaved unusually for a three-year-old because he 
lacked spontaneity, was obsessive about cleanliness and order, was always 
putting things away, and was hyper-aware of how Iafrate was reacting to him 
before he did anything.  Comparatively, normal three-year-olds are very 
spontaneous, carefree, and are not very concerned with making sure that 
everything is returned to its proper place.
        Iafrate initiated play 
therapy with A.J.L. using a scenario given to her by A.J.L.’s foster mother. 
She created a scene with puppets that was similar to what the foster mother had 
described to her. Iafrate 
designated one larger turtle puppet as the mother, and smaller turtles as the 
little boy and the baby girl.  When A.J.L was unwilling to tell the story 
himself, Iafrate 
began the story saying that the boy turtle puppet was busy doing something and 
the mom turtle puppet wanted him to do something else.  The boy turtle 
puppet wanted to keep doing what he was doing, so the mom turtle puppet began to 
approach the baby girl turtle puppet and the boy turtle puppet said, “No, no, 
no.  Stop. I'll do it. I'll do it.”
        After 
Iafrate told that 
story, she asked A.J.L. if he would like another puppet to help the little boy. 
A.J.L. chose a mouse.  Iafrate 
described this as a therapeutic technique where the child chooses a puppet that 
can be a type of counselor, or someone to help him.  Because Iafrate had observed that 
the boy turtle puppet had acted to stop the mom turtle puppet before she got to 
the baby girl turtle puppet, she asked A.J.L. to show her what the mom turtle 
puppet did to the baby girl turtle puppet that he felt he had to stop.  In 
response, A.J.L. made a fist with his left hand, made a grabbing motion on the 
table top, and then returned his hand to a fist.  At the end of the same 
session, A.J.L. initiated the puppet play and had the mom turtle puppet pounce 
on the baby girl turtle puppet and then grab the baby girl turtle puppet with 
its hands.
        At 
another session, when A.J.L. came in he pointed to the turtle puppet family and 
said that he wanted Iafrate 
to tell the same story with the puppets as before.  So she took the boy 
turtle puppet and the mouse puppet and told the story again.  This time the 
boy turtle puppet was coloring and the mom turtle puppet wanted him to take out 
the trash.  When the boy turtle puppet said he would do it later, the mom 
turtle puppet started to approach the baby girl turtle puppet.  The boy 
turtle puppet said, “Okay, mom. I will do it. Don’t hurt.” When Iafrate asked, “what 
would the mom do to the boy turtle?”, A.J.L. took the mom turtle puppet and 
used it to pounce on the baby girl turtle puppet.
        He 
then put the baby girl turtle puppet on his right hand, and she had him put the 
boy turtle puppet on the other.  Iafrate used the mouse 
puppet to ask him questions, but A.J.L. would not say yes or no, so they 
established that, using the turtle puppets, two taps would be “yes” and one 
tap would be “no.” First she used the mouse puppet and asked the baby 
girl turtle puppet, “Does mom ever hurt you?”  He tapped twice with 
the puppet for yes.[3]  Iafrate continued stating 
that the mouse puppet then asked the baby girl turtle puppet, “Do you 
ever tell her to stop?” and the baby girl turtle puppet tapped once for no. 
She asked, “Do you ever try to run away?” and he tapped twice for yes.
        Next, 
she had the mouse puppet say to the boy turtle puppet, “Well, do you 
ever try to stop the mom from hurting the baby?” and he tapped twice for 
yes.  With regard to hurting the baby, she asked, “Do you ever tell her 
to stop?”  He tapped twice for yes.  She then asked, “Do you ever 
try to run away?” and he tapped twice for yes.
        When 
they worked with the puppets during the next few visits, A.J.L directed Iafrate to use the mom 
turtle puppet to pounce and jump on the baby girl turtle puppet.  When she 
would do this, A.J.L. would use the boy turtle puppet to grab the baby girl 
turtle puppet away before the mom turtle puppet could get her.  Iafrate opined that this 
play indicated that A.J.L. felt like he had to protect his little sister from 
something going on at home.
        When 
asked to contrast A.J.L.’s behavior when he first came to therapy with Iafrate with his behavior 
after fourteen sessions of therapy, Iafrate stated that, at the 
start, A.J.L. was fairly rigid, not spontaneous, and obsessive about things 
being clean and put away.  At the end he was spontaneous, carefree, bouncy, 
had stopped seeking approval for his actions, and was very much into what he was 
doing.  She noted that his rapid behavioral improvement was likely due to 
the fact that, in foster care, he was in a home environment where he felt safe 
and secure.
        Based 
upon Iafrate’s 
education, experience and training, her interaction and observations of children 
using play therapy, together with a total absence of any evidence to refute the 
validity of play therapy, we hold that the trial court did not abuse its 
discretion in qualifying Iafrate 
as an expert witness and allowing her to testify regarding her therapy sessions 
with A.J.L.  Moreover, we hold that her testimony was sufficiently reliable 
under Nenno and the trial court did not err by allowing it.
        Appellant 
also complains that Iafrate’s 
opinion testimony was based upon hearsay.  Specifically, she complains of 
the testimony regarding the session where A.J.L. tapped on the table in response 
to yes and no questions.  An expert may form opinions or make inferences on 
facts that are not otherwise admissible into evidence if those facts are of the 
kind reasonably relied upon by experts in the field. Tex. R. Evid. 703; Stam v. Mack, 984 S.W.2d 
747, 750 (Tex. App.—Texarkana 1999, no pet.); Sosa ex rel. Grant v. Koshy, 
961 S.W.2d 420, 427 (Tex. App.—Houston [1st Dist.] 1997, no 
pet.).  An expert may testify regarding the underlying facts and data 
supporting an expert opinion.  Stam, 984 S.W.2d at 750; Sosa, 
961 S.W.2d at 427.  We hold that the trial court did not err by admitting 
this portion of Iafrate’s 
testimony.  Accordingly, we overrule appellant’s second point.
FACTUAL SUFFICIENCY
        In 
her supplemental points one, two and three, appellant complains that the 
evidence is factually insufficient to support the jury’s findings under family 
code sections 161.001(1)(D) (endangerment by conditions or surroundings), (E) 
(endangerment by conduct) and 161.001(2) (best interest of the child). Tex. Fam. 
Code Ann. §§ 161.001 (1)(D), (2).[4]  To 
preserve a challenge to the factual sufficiency of the evidence for appellate 
review, the party must file a motion for new trial in the trial court.  Tex. R. Civ. P. 324(b)(2), (3); Cecil v. 
Smith, 804 S.W.2d 509, 510 (Tex. 1991); In re J.M.S., 43 S.W.3d 60, 
62 (Tex. App.—Houston [1st Dist.] 2001, no pet.); In re C.E.M., 
64 S.W.3d 425, 428 (Tex. App.—Houston [1st Dist.] 2000, no 
pet.).  Appellant did not file a motion for new trial.  Therefore, she 
has waived her right to complain about the factual sufficiency of the evidence 
to support the jury’s findings.  See J.M.S., 43 S.W.3d at 62 
(holding that sufficiency issues must be properly preserved in termination of 
parental rights case just as in any other civil case); C.E.M., 64 S.W.3d 
at 427-28 (same).  The portions of supplemental points one and two that 
complain of factual insufficiency are waived.  Supplemental point three 
only challenges the factual insufficiency of the evidence to support the 
jury’s best interest finding.  Because appellant waived all of her 
factual sufficiency challenges on appeal, we overrule appellant’s supplemental 
point three in its entirety.
LEGAL INSUFFICIENCY
        In 
appellant’s supplemental points one and two, she also complains that the 
evidence was legally insufficient to prove that she knowingly placed or allowed 
the children to remain in conditions and surroundings that endangered their 
physical or emotional well being, and engaged in conduct or knowingly placed the 
children with persons who engaged in conduct that endangered their physical or 
emotional well being.
        A 
parent’s rights to “the companionship, care, custody and management” of 
his or her children are constitutional interests “far more precious than any 
property right.”  Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. 
Ct. 1388, 1397 (1982).  “While parental rights are of constitutional 
magnitude, they are not absolute.  Just as it is imperative for courts to 
recognize the constitutional underpinnings of the parent-child relationship, it 
is also essential that emotional and physical interests of the child not be 
sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 
17, 26 (Tex. 2002).  In a termination case, the State seeks not just to 
limit parental rights but to end them permanently—to divest the parent and 
child of all legal rights, privileges, duties, and powers normally existing 
between them, except for the child’s right to inherit.  TEX. FAM. CODE ANN. § 
161.206(b) (Vernon Supp. 2004); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 
1985).  We strictly scrutinize termination proceedings and strictly 
construe involuntary termination statutes in favor of the parent.  Holick, 
685 S.W.2d at 20-21; In re D.T., 34 S.W.3d 625, 630 (Tex. App.—Fort 
Worth 2000, pet. denied) (op. on reh’g).
        Termination 
of parental rights is a drastic remedy and is of such weight and gravity that 
due process requires the petitioner to justify termination by “clear and 
convincing evidence.”  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); In re G.M., 
596 S.W.2d 846, 847 (Tex. 1980).  This intermediate standard falls between 
the preponderance standard of ordinary civil proceedings and the reasonable 
doubt standard of criminal proceedings.  G.M., 596 S.W.2d at 847; D.T., 
34 S.W.3d at 630. It is defined as the “measure or degree of proof that will 
produce in the mind of the trier of fact a firm belief or conviction as to the 
truth of the allegations sought to be established.”  Tex. Fam. Code Ann. § 101.007 (Vernon 2002).
        The 
higher burden of proof in termination cases alters the appellate standard of 
legal sufficiency review. In re J.F.C., 96 S.W.3d 256, 265 (Tex. 
2002).  The traditional no-evidence standard does not adequately protect 
the parent’s constitutional interests.  Id.  In reviewing the 
evidence for legal sufficiency in parental termination cases, we must determine 
“whether the evidence is such that a factfinder could reasonably form a firm 
belief or conviction” that the grounds for termination were proven.  Id. 
at 265-66.  We must review all the evidence in the light most favorable to 
the finding and judgment.  Id. at 266.  This means that we must 
assume that the factfinder resolved any disputed facts in favor of its finding 
if a reasonable factfinder could have done so.  Id.  We must 
also disregard all evidence that a reasonable factfinder could have 
disbelieved.  Id. We must, however, consider undisputed evidence 
even if it does not support the finding.  Id.
ENDANGERMENT BY CONDUCT
        First, 
we will review the evidence of endangerment by conduct under family code section 
161.001(1)(E). Tex. Fam. Code Ann. § 161.001(1)(E).  When 
appellant was approximately seven months to a year old, her mother abandoned 
her, leaving her with her grandmother.  Her grandmother went to George and 
Betty Tidwell for help in caring for appellant.  The Tidwells helped care 
for appellant part-time until they got full custody of her at age eleven or 
twelve.  Appellant began sneaking out, having behavioral problems, and 
using drugs.  The Tidwells eventually placed her in a long-term residential 
psychological treatment facility for a year.  By age fourteen she was in 
the custody of DFPS.
        Appellant 
ran away from custody often and got involved with drugs and prostitution by age 
sixteen. By age twenty-five, appellant had an extensive criminal history.  
At age nineteen, in 1995, she was convicted of theft and was placed on 
probation.  She was also convicted of theft in 1996 and received probation 
to be served concurrently with the 1995 offense.  However, the probation 
was revoked and she went to jail for a month in October of 2000.  She was 
again convicted of theft in July 2001, this time a felony offense, and received 
three years’ probation.  At the time of the termination trial, appellant 
had been incarcerated for seventy-six days because the State had filed a motion 
to revoke her probation for the felony offense.
        Appellant 
gave birth to her first child, A.J.L., while living in Kansas in September of 
1998. Appellant’s history with KCPS began in December of 1998 and continued as 
follows:
 
(1) A.J.L. was three months 
old in December 1998 when KCPS first investigated appellant for possible abuse 
because A.J.L. had a bruise or scratch on his cheek. Appellant claimed that a 
two-year-old girl was jumping on the bed and hit A.J.L. with her shoe and caused 
the mark.
 
(2) During the same 
investigation, KCPS asked appellant about a bite mark on A.J.L.’s leg and an 
accident that sent A.J.L. to the emergency room with a bloody nose. Appellant 
claimed a girl at daycare bit him and that he got the bloody nose when she was 
carrying him and fell.
 
(3) A.J.L. was four months old 
when KCPS investigated appellant again for physical abuse of A.J.L. because he 
had a bump on his head. Appellant claimed that he had fallen off the couch and 
hit his head.
 
        (4) 
KCPS removed A.J.L. from appellant’s custody in 1999.
  
 
        After 
KCPS removed A.J.L., the Tidwells went to Kansas and convinced the Kansas trial 
court to release appellant and A.J.L. into their custody.  The trial court 
agreed, and appellant and A.J.L. moved back to Denton, Texas with the Tidwells 
for six months.
        The 
Texas DFPS began investigating appellant in September 2000 because of an 
allegation of abuse of A.J.L.  Specifically, A.J.L. had a burn on his hand 
and a bite mark on his chest. Appellant claimed that she had left the iron on 
the floor, plugged in, but set on “off.”  She assumed that while she 
was taking a nap on the couch, A.J.L. turned the iron on and burned his hand by 
accident.  The burn covered the back of his hand and his first three 
fingers.  Appellant woke up to A.J.L. crying.  He pointed to the iron 
and said, “Hurt.”
        Appellant 
claimed that the bite on A.J.L.’s chest occurred when she bit him in her sleep 
because she was having a nightmare.  DFPS removed A.J.L. from appellant’s 
custody and placed him with the Tidwells.  However, after appellant 
completed the required DFPS service plan, DFPS returned A.J.L. to appellant in 
June 2001.
        Meanwhile, 
appellant gave birth to C.R.L. in March 2001.  C.R.L.’s father was Donald 
Wall.[5]   DFPS investigated appellant again 
in December 2001.  At the time, A.J.L. was three years old and C.R.L. was 
nine months.  This time, DFPS investigated appellant for abuse of C.R.L. 
when daycare workers reported that C.R.L. had a large two-inch bruise on her 
forehead when she was dropped off at daycare.  Appellant claimed that C.R.L. 
did not have the bruise when she dropped her off that morning. Appellant told 
the investigators that the injury must have been caused by “bedhead,” 
sleeping pressed against her blankets, or by hitting her head on the playpen.
        DFPS 
called the police in to investigate.  During their investigation, the 
police noted that the playpen did not have any hard parts and the sides were 
made of mesh.  Additionally, the police spoke to many witnesses who had 
heard A.J.L. say that appellant had caused C.R.L.’s injury.  DFPS removed 
the children from appellant’s custody in December 2001.  The children 
were initially placed with the Tidwells, and DFPS brought termination 
proceedings against appellant. By September 2002, appellant had been 
incarcerated because the State initiated proceedings to revoke her probation for 
her prior felony offense.
        At 
trial, multiple witnesses testified to appellant’s violent nature.  Both 
Betty and George Tidwell testified at trial and described appellant as 
violent.  Betty Tidwell stated that when appellant was a baby she bit 
people all the time.  Appellant admitted that at age fourteen, while she 
was living with the Tidwells, she bit Betty Tidwell during an argument.  
The bite was severe enough to leave a permanent scar. George Tidwell testified 
that on one occasion when appellant lived at their house, she cut the 
neighbor’s arm with a pocket knife.  Additionally, both of the Tidwells 
described a fight that appellant had with their daughter after A.J.L. was born 
during which appellant attempted to blind her by clawing her eyes out.
        The 
Tidwells also described two instances in which appellant had threatened to kill 
them.  After appellant lived in the long-term residential treatment 
facility, the Tidwells dropped their suit to get custody of her and relinquished 
her into DFPS custody.  Around this time, appellant called Betty Tidwell 
and told her that she was going to come back to their house on her seventeenth 
birthday and kill her.  Years later, after the birth of her children, 
appellant called the Tidwells in June of 2002 and told George, “I swear to 
God, if I lose these kids, I’m going to kill you and your family.”  In 
response to this threat, the Tidwells got a protective order against 
appellant.  Both Betty and George Tidwell believe appellant was capable of 
killing them during one of her fits of rage.
        Denton 
Police officer Tim Scott testified that he investigated appellant for assault in 
August 2002. The incident occurred at William Fields’s house.  
Apparently, appellant went to his house, argued with Fields and bit his upper 
arm during the argument.  The officer saw the bite and noted that it was 
bloody and that the blood ran all the way down Fields’s arm to his fingers, 
the skin was gnarled, and the bite was the type that grabbed hold and ripped the 
skin loose.  He opined that it was a “nasty” bite.  Officer Scott 
noted that appellant seemed high on drugs.  The police arrested appellant 
for assault/family violence.
         At 
another time, appellant got into a fight with a friend named Linda Nabors. While 
the two were arguing, appellant got into her car and left, and Nabors followed 
in her own car.  Nabors decided to give up the chase and passed appellant 
as she drove away, when appellant began following Nabors.  Eventually, 
Nabors pulled over onto the side of the road to attempt to talk to 
appellant.  As she stood in front of appellant’s car, appellant 
accelerated and hit Nabors, throwing her up onto the hood of the car and causing 
serious injuries.
        After 
a review of the evidence, we hold that the physical symptoms of abuse on the 
children, appellant’s admitted drug abuse, her criminal history and 
incarceration, the expert witness testimony regarding A.J.L., appellant’s long 
history with DFPS and KCPS, and her continuing course of violent conduct are all 
sufficient to support the jury’s finding that appellant engaged in conduct or 
knowingly placed the children with persons who engaged in conduct that 
endangered their physical or emotional well being.  We overrule the 
remainder of appellant’s supplemental point two.
ENDANGERMENT BY ENVIRONMENT OR SURROUNDINGS
        To 
support the trial court’s order terminating appellant’s parental rights, the 
State only had to present sufficient evidence to support one of the section 
161.001(1) factors and show that termination was in the best interest of the 
child under section 161.001(2).  Tex. Fam. Code Ann. § 161.001; In re C.A.J., 
122 S.W.3d 888, 892-93 (Tex. App.—Fort Worth 2003, no pet.); In re W.J.H., 
111 S.W.3d 707, 714 (Tex. App.—Fort Worth 2003, pet. denied); In re W.S., 
899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). Because we hold that 
there was sufficient evidence to support the jury’s findings under family code 
section 161.001(1)(E) and because appellant waived her complaint regarding best 
interest under section 161.001(2), we need not address appellant’s 
supplemental point one complaining of legal insufficiency under section 
161.001(1)(D).  See Tex. Fam. Code Ann. § 161.001; Tex. R. App. P. 47.1; In re S.F., 32 S.W.3d 318, 
320 (Tex. App.—San Antonio 2000, no pet.). We overrule the remainder of 
supplemental point one.
CONCLUSION
        Having 
overruled all of appellant’s points, we affirm the trial court’s order of 
termination.
  
                                                                  TERRIE 
LIVINGSTON
                                                                  JUSTICE
  
 
PANEL A:   LIVINGSTON, 
DAUPHINOT, and MCCOY, JJ.
 
DELIVERED: April 29, 2004

 
NOTES
1. 
    (1) the extent to which the theory has been 
or can be tested;
(2) 
the extent to which the technique relies upon the subjective interpretation of 
the expert;
(3) 
whether the theory has been subjected to peer review and/or publication;
(4) 
the technique's potential rate of error;
(5) 
whether the underlying theory or technique has been generally accepted as valid 
by the relevant scientific community; and
(6) 
the non-judicial uses which have been made of the theory or technique.
Gammill, 
972 S.W.2d at 720
2.  
See In re A.V., 849 S.W.2d 393, 401 (Tex. App.—Fort Worth 1993, no 
writ); Puderbaugh v. State, 31 S.W.3d 683, 685-86 (Tex. App.—Beaumont 
2000, pet. ref’d); In re M.T., 21 S.W.3d 925, 929 (Tex. App.—Beaumont 
2000, no pet.); see also Campos v. State, 977 S.W.2d 458, 463-64 (Tex. 
App.—Waco 1998, no pet.) (allowing expert testimony based upon play therapy in 
child sexual assault case).
3.  
At this point in the testimony, appellant objected on the basis of hearsay and 
the trial court overruled her objection.
4.  
In appellant’s brief, she cites "Tex. Fam. Code, Sec. 161.003(D)" 
and "Tex. Fam. Code Sec. 161.003(E)" when discussing legal and factual 
insufficiency on the grounds for termination. However, she tracks the language 
used in sections 161.001(1)(D),(E) and 161.001(2). Tex. Fam. Code Ann. §§ 
161.001(1)(D),(E), (2).  Section 161.003 of the family code does not have a 
section (E), and section 161.003(d) states, “An attorney appointed under 
Subsection (b) shall represent the parent for the duration of the suit unless 
the parent, with the permission of the court, retains another attorney.” Tex. Fam. Code Ann. § 
161.003(d).  Appellant does not complain that there was any error regarding 
representation by her attorney.  Therefore, we presume that appellant 
intended to refer to family code sections 161.001(1)(D),(E) and 161.001(2) and 
will conduct our analysis accordingly.
5.  
A.J.L.’s father was Randall “Scotty” Trevino.